1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9         FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11   ESPERANZA ISABEL VALVERDE,     ) | No. C 13-05353 LHK (PR) |
|                         ) | |
| 12        Petitioner,          ) | ORDER DENYING PETITION FOR WRIT OF |
|                         ) | HABEAS CORPUS AND DENYING |
| 13      v.                  ) | CERTIFICATE OF APPEALABILITY |
|                         ) | |
| 14                         ) | |
|   PEOPLE OF THE STATE OF       ) | |
| 15   CALIFORNIA,           ) | |
|                         ) | |
| 16        Respondent.       ) | |
|                         ) | |
| 17 _____) | |

**United States District Court** (left margin vertical text)
For the Northern District of California (left margin vertical text)

18       Petitioner has filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254

19 challenging her state conviction.  Respondent was ordered to show cause why the petition should

20 not be granted.[1]  Respondent has filed an answer, and petitioner filed a traverse.  Having reviewed

21 the briefs and the underlying record, the court concludes that petitioner is not entitled to relief, and

22 DENIES the petition.

23                             **BACKGROUND**

24       Petitioner[2] was found guilty by a jury in Santa Clara County of 24 counts of grand theft,

25 _____

26      [1]This case was reassigned to the undersigned judge on November 9, 2015.  (*See* Docket No. 38.)

27      [2]Petitioner was jointly tried with her husband, co-defendant Herman Michael

28 Covarrubias.  Mr. Covarrubias filed a federal habeas petition of his own, which is before a different court.  *See* Case No. 13-4611 EMC (PR).

nine counts of committing a fraudulent notarial act on a deed of trust, and seven counts of forgery. The jury also found true "excessive taking" allegations.  In October 2008, petitioner was sentenced to twenty-three years and eight months in state prison.

Petitioner appealed the conviction.  The state appellate court affirmed the conviction on July 25, 2012, (Ans. Ex. 1), and the state high court denied review on November 14, 2012, (*id.*, Ex. 4).

Petitioner filed state habeas petitions challenging the conviction.  The state superior court denied the petition on substantive and procedural grounds on January 16, 2013.  (*Id.*, Ex. 6.)  The state appellate and high courts summarily denied the petitions, with the latter decision filed on October 30, 2013.  (*Id.*, Exs. 8, 10.)

Petitioner filed the instant federal habeas petition on November 19, 2013.

**BACKGROUND**

The California Court of Appeal set forth the following facts[3]:

**I. Factual Background**

Valverde and her husband Covarrubias were mortgage brokers.  A prospective borrower engages the services of a mortgage broker to work with wholesale lenders on the borrower's behalf.  The wholesale lender's loan representative works directly with the broker, not the borrower.  The broker submits a loan application and other documentation on behalf of the borrower to the wholesale lender's loan representative.  This documentation is then forwarded to the wholesale lender's loan underwriter, who makes the decision whether to fund the loan.  The purpose of the underwriting process is to ensure that the borrower will be able to repay the loan.

This case involved five wholesale lenders: Argent Mortgage Corporation (Argent), BNC Mortgage (BNC), Downey Savings and Loan (Downey), WMC Mortgage (WMC), and World Savings (World).  These lenders relied on the information on the loan applications and documentation submitted by brokers to determine whether the borrowers would be able to repay the loan.  Where the application was for a "stated income" loan, the lender relied on the broker to ensure that the borrower's stated income was accurate. [FN3] Typically, the underwriter would issue

_____

[3]The facts of this case are taken from the California Court of Appeal opinion in *People v. Valverde, et al.*, No. H034263 (Cal. App. 6 Dist. Jul. 25, 2012).  (Ans. Ex. 1 ("Op.").)

a conditional loan approval that required further documentation.  The loan would not actually be funded until the conditions were met.

> FN3. Some of the wholesale lenders offered only stated income loans, while others offered a variety of loan types.

Because the broker's fees are funded from the total loan amount, the borrower ends up paying those fees.  Typically the broker's fee is 1 percent of the loan amount, but it may legally be as high as 5 percent.  The wholesale lender may require a longer prepayment penalty period if the broker's fee is high in order to ensure that the lender profits from the loan.  The borrower on a refinancing transaction had the legal right to cancel the transaction within three days after signing the document.

Defendants acted as brokers on numerous transactions with these five wholesale lenders.  These were subprime loans.  Subprime loans include stated income loans, loans to borrowers with poor credit scores, and loans with high loan-to-value ratios.  Many of the borrowers represented by defendants did not speak or read English, could not read the documents (which were always in English), and did not understand the details of the transactions.  Defendants lied to these borrowers about the amounts of their fees and misrepresented the terms of the loans.  Valverde notarized backdated deeds of trusts in order to prevent the borrowers from exercising their rights to cancel refinancing transactions.  Defendants prepared and submitted loan applications that misrepresented the borrowers' income and assets, and forged documents to support those applications.

## II. Procedural Background

Defendants were jointly charged by indictment with 19 counts of grand theft [counts 5, 12, 15, 19, 21, 23, 24, 26, 28, 29, 31, 33, 36, 37, 38, 41, 43, 44, and 46] and two counts of forgery [counts 39 and 40].  Valverde alone was charged with an additional seven counts of grand theft [counts 1, 2, 3, 6, 7, 9, and 10], 12 counts of committing a fraudulent notarial act on a deed [counts 8, 11, 13, 16, 22, 25, 27, 30, 32, 42, 45, and 47], and five counts of forgery [counts 14, 17, 18, 34, and 35]. [FN4] Covarrubias alone was charged with one count of forgery [counts 20].  The indictment also alleged excessive taking allegations under sections 186.11 and 12022.6 against both defendants.

> FN4. Count 4, which was another grand theft count against Valverde, was dismissed at the commencement of trial.

After lengthy deliberations, the jury returned verdicts finding defendants guilty of nearly all of the counts.  On count 3, Valverde was found guilty as to only the lender but not to the borrowers.  She was also acquitted of counts 9 and 10, which were grand theft counts, and counts 27, 32, and 42, which were fraudulent notarial act counts.  Valverde was convicted of the remaining counts.  Covarrubias was convicted of all of the charged counts.  The enhancement allegations were found true as to both defendants, as was a probation-related excessive taking allegation.

In May 2009, Valverde was sentenced to 23 years and eight months in state prison. She was awarded 67 days of actual custody credit

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  and 32 days of conduct credit.  Covarrubias was sentenced at the same
2  time to 19 years and eight months in state prison.  He was awarded 61
   days of actual custody credit and 30 days of conduct credit.  Both of them
3  timely filed notices of appeal.

4        In February 2010, defendants filed motions seeking additional
   conduct credit under the newly revised version of section 4019 that had
5  taken effect in January 2010. The prosecution conceded that defendants
   were entitled to the additional credit they sought.  In April 2010, the trial
6  court granted defendants' motions and awarded Valverde an additional 34
   days of conduct credit and Covarrubias an additional 30 days of conduct
7  credit.

8  (Op. at 2-5.)

9                          **DISCUSSION**

10  I.     Standard of Review

11        This court may entertain a petition for writ of habeas corpus "in behalf of a person in

12  custody pursuant to the judgment of a state court only on the ground that he is in custody in

13  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under

14  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not

15  grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed

16  on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a

17  decision that was contrary to, or involved an unreasonable application of, clearly established

18  federal law, as determined by the U.S. Supreme Court of the United States; or (2) resulted in a

19  decision that was based on an unreasonable determination of the facts in light of the evidence

20  presented in the state court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to

21  questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86

22  (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v.*

23  *Cockrell*, 537 U.S. 322, 340 (2003).

24        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

25  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

26  the state court decides a case differently than [the] Court has on a set of materially

27  indistinguishable facts."  *Williams*, 529 U.S. at 412-13.  A state court decision is an "unreasonable

28  application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the

state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.  The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion. *See Ylst*, 501 U.S. at 805.  In this case, that is the opinion of the California Court of Appeal on direct review as to four of the claims, (Ans. Ex. 6), and the state superior court opinion denying petitioner's habeas petition as to other claims, (*id.*, Ex. 8).

The U.S. Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v. Richter*, 131 S. Ct. 770, 783-85 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per curiam).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating

*United States District Court*
For the Northern District of California

1   state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Id.*

2   at 1307 (citation omitted).  With these principles in mind regarding the standard and limited scope

3   of review in which this court may engage in federal habeas proceedings, the court addresses

4   petitioner's claims.

5   II.    <u>Claims and Analysis</u>

6          Petitioner states the following claims as grounds for federal habeas relief: (1) the trial

7   court's refusal to grant petitioner's discovery request for, and the trial court's exclusion of,

8   evidence of a general industry practice of lending to unqualified borrowers denied petitioner her

9   federal constitutional rights to due process and to present a defense; (2) petitioner's right to due

10  process was violated because the evidence was insufficient to support the sentence enhancements

11  under California Penal Code § 186.11 and § 12022.6; (3) the trial court violated petitioner's Sixth

12  and Fourteenth Amendment rights by failing to instruct the jury as to the definition of "a loss" in

13  the sentence enhancement allegations;[4] (4) the trial court abused its discretion when it sentenced

14  petitioner to the term of 23 years and 8 months; (5) the use of false evidence to convict petitioner

15  deprived her of her federal constitutional right to a fair trial; (6) the search and seizure of Summit

16  Mortgage Office was illegal, in violation of petitioner's Fourth Amendment rights; (7) petitioner's

17  federal right to due process was violated because the jurors were exposed to general news about

18  the collapse of the financial markets but the trial court would "not allow[] evidence on how the

19  subprime market really worked," (Pet. at 6); (8) petitioner's right to due process was violated by

20  the prosecutor's misconduct in presenting false evidence; (9) petitioner's federal constitutional

21  right to a fair trial was violated because the "prosecutor deliberately misled defense about the

22  theory of [petitioner's] guilt," (*id.* at 7); (10) petitioner's right to due process was violated because

23  petitioner "was convicted on the basis of facts different than those facts on which the charges were

24  based," and the indictment was changed at the end of trial, (*id.*); (11) petitioner's right to due

25  process was violated by a vindictive prosecution; (12) petitioner's right to due process was

26

27         [4]The page containing claims 3 and 4 was misplaced in the petition filed with the court.
28  Claims 1 and 2 are on page 4 of Docket No. 1, followed by Claims 5 and 6 on page 5; Claims 3
    and 4 appear on page 13 of Docket No. 1.

1   violated because the "prosecutor sent people to the federal government to open a civil case"

2   against petitioner as a tactic to deplete her of her resources and ability to properly defend herself,

3   (*id.* at 8); (13) petitioner's right to due process was violated by the bad faith destruction of

4   potentially exculpatory evidence; (14) petitioner's right to due process was violated because the

5   prosecutor stopped or edited undercover surveillance tape; (15) petitioner was deprived of her

6   constitutional right to a fair trial because the trial judge was biased; (16) the cumulative effect of

7   the errors deprived petitioner of a fair trial; (17) petitioner was deprived of her Sixth Amendment

8   right to effective assistance of counsel when counsel "didn't use evidence against alleged victims,"

9   (*id.* at 11); and (18) petitioner's right to due process and Eighth Amendment rights were violated

10  because "a single conspiracy was unconstitutionally used to impose a sentence for multiple

11  conspiracies," (*id.*).   Liberally construed, the court found the claims cognizable under § 2254 with

12  the exception of Claim 6 which was dismissed as a Fourth Amendment claim that is barred by

13  *Stone v. Powell*, 428 U.S. 465 (1976).  (Docket No. 8 at 3-4.)

14       A.      Procedural Default

15       As a matter of comity and federalism, a federal court on federal habeas will not review

16  questions of federal law decided by a state court if that decision also rests on a state law ground

17  that is independent of the federal question and adequate to support the judgment.  *Coleman v.*

18  *Thompson*, 501 U.S. 722, 729-30 (1991).  The procedural default rule is a specific instance of the

19  more general "adequate and independent state grounds" doctrine.  *Wells v. Maass*, 28 F.3d 1005,

20  1008 (9th Cir. 1994).

21       It is only the violation of a state procedural rule, and not, for example, mere failure to raise

22  a claim in circumstances where no rule requires raising it, that triggers the procedural default

23  doctrine.  *See English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994) (§ 2255 case; not

24  procedural default to fail to raise claims for first time in petition for certiorari or motion to recall

25  mandate, either of which would have been improper).  "Procedural default requires the by-pass of

26  a procedural requirement, and not merely the by-pass of a procedural opportunity."  *Id.* (citation

27  and internal quotation marks omitted).

28       In cases in which a state prisoner has defaulted his federal claims in state court pursuant to

United States District Court

For the Northern District of California

an independent and adequate state procedural rule, federal habeas review of the claims is barred

unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  A petitioner must establish factual

innocence in order to show that a fundamental miscarriage of justice would result from application

of procedural default.  *See Gandarela v. Johnson*, 275 F.3d 744, 749-50 (9th Cir. 2002); *Wildman

v. Johnson*, 261 F.3d 832, 842-43 (9th Cir.  2001).

Respondent asserts that Claims 9, 10 and 16 are procedurally defaulted because they were

not presented – or not properly presented – to the California Supreme Court.  (Ans. at 5.)

Respondent argues that because petitioner has not alleged cause and prejudice or a fundamental

miscarriage of justice, this court is precluded from considering the claims on the merits.  (*Id.* at 6.)

Respondent points to the Santa Clara County Superior Court decision denying petitioner's state

habeas petition citing *In re Harris*, 5 Cal.4th 813, 825, 829:

> Many of Petitioner's allegations were rejected on appeal or could have
> been raised on appeal but were not, and therefore do not form a basis for
> relief.  The California Supreme Court had reiterated and clearly defined the
> limitation of the availability of habeas corpus relief, expressly stating that
> "habeas corpus will not serve as a second appeal" (In Re Harris (1993) 5
> Cal.4th 813, 825) nor "as a substitute for an appeal (Harris, supra, at 826).
> Therefore, habeas corpus relief is not available for claims that were raised and
> rejected on direct appeal (Harris, supra, at 825) or "where the claimed errors
> could have been , but were not raised upon a timely appeal from a judgment."
> (Harris, supra, at 829.)

(Ans. Ex. 8. at 1.)

The California Supreme Court's ruling in *In re Dixon*, 41 Cal.2d 756, 264 P.2d 513 (1953),

provides that to bring a claim in a state habeas corpus action, a petitioner must first, if possible,

have pursued the claims on direct appeal from his conviction unless the claim falls within certain

exceptions.  *See Park v. California*, 202 F.3d 1146, 1151 (9th Cir. 2000).  This is known as the

"*Dixon* rule."  *See id.*  The *Dixon* rule bars a petitioner from raising a claim in a habeas proceeding

that could have been, but was not, raised on appeal.  *In re Harris*, 5 Cal. 4th 813, 934 (1993).  In

*Harris*, the California Supreme Court set specific standards for the application of the *Dixon* rule.

*See Park*, 202 F.3d at 1151-52 & n.3.  The exceptions summarized in *Harris* are: (1) fundamental

United States District Court

For the Northern District of California

1    constitutional error; (2) lack of jurisdiction over the petitioner; (3) the trial court's acting in excess

2    of its jurisdiction or (4) an intervening change in the law.  *See Park*, 202 F.3d at 1152.  *Harris*'s

3    "fundamental constitutional error" exception permits a hearing on the merits of a state habeas

4    petition "when the habeas corpus petitioner claims a violation of his or her fundamental

5    constitutional rights."  *In re Harris*, 5 Cal. 4th at 829.

6          Although the *Dixon* rule was not consistently applied before *Harris* was decided, *see*

7    *Fields v. Calderon*, 125 F.3d 757, 765 (9th Cir. 1997) (refusing to honor *Dixon* rule where default

8    occurred before *Harris*), federal courts have since upheld application of the *Dixon* rule where the

9    petitioner has failed to present authority that the *Dixon* rule has been inconsistently applied.  *See*

10   *Protsman v. Pliler*, 318 F. Supp. 2d 1004, 1013-14 (S.D. Cal. 2004) (finding that the *Dixon* rule

11   rests on independent and adequate state law grounds); *accord Flores v. Roe*, 228 Fed. Appx. 690,

12   691 (9th Cir. 2007) (where respondent adequately raised *Dixon* procedural bar defense to petition,

13   burden shifted to petitioner to place the defense at issue by asserting factual allegations that

14   demonstrate the inadequacy of the state procedure, including citation to authority demonstrating

15   inconsistent application of the rule); *see also Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir.

16   2003).

17         Here, petitioner has failed to overcome the procedural bar under the *Harris/Dixon* rule in

18   either the petition or traverse.  Rather, petitioner asserts for the first time in her traverse that her

19   trial and appellate attorneys told her that a lot of her claims would have to be presented in state and

20   federal habeas petitions, and provides a letter from the latter as "proof."  (Trav. at 6, Ex. 1.)

21   However, the letter, which is addressed to petitioner's co-defendant Mr. Covarrubias, merely states

22   that counsel would not be able to provide any assistance in preparing a petition and makes no

23   mention of any specific claims.  (*Id.*)  Nor does petitioner claim that ineffective assistance of

24   counsel was cause for excusing procedural default.  *See McCleskey v. Zant*, 499 U.S. 467, 494

25   (1991).  Accordingly, petitioner has failed to meet her burden of demonstrating the inadequacy of

26   the *Harris/Dixon* rule to overcome this procedural bar.  Claims 9, 10 and 16 are DISMISSED as

27   procedurally defaulted.

28   ///

United States District Court
For the Northern District of California

B.      Exhaustion

Respondent also argues that because petitioner never presented Claims 12, 17 and 18 to any state court in any proceeding, those claims are unexhausted and must either be denied on the merits or summarily denied.  (Ans. at 7.)  Petitioner does not dispute her failure to exhaust these claims in her traverse.

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are first required to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  *See* 28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509, 515-16 (1982); *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981); *McNeeley v. Arave*, 842 F.2d 230, 231 (9th Cir. 1988).  The state high court must be given an opportunity to rule on the claims even if review is discretionary.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (petitioner must invoke "one complete round of the State's established appellate review process.").

It appears from the filed papers that petitioner did not raise Claims 12, 17 and 18 either on direct appeal, (Ans. Ex. 1), or in any of her state habeas petitions, (*id.*, Exs. 5, 7, 9).  Accordingly, these claims are unexhausted.  Although the court may deny the claims on the merits even if they are unexhausted, *see* 28 U.S.C. § 2254(b)(2),[5] we are not required to do so.  *See Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999).  Therefore, Claims 12, 17 and 18 are DISMISSED without prejudice as unexhausted.

C.      Remaining Claims

    1.      Evidence of Lending Practices (Claims 1 & 7)

Under Claim 1, petitioner claims that the trial court erred in denying her discovery request for evidence showing the general industry practice of lending to unqualified borrowers and then erred in excluding the evidence at trial.  Under Claim 7, petitioner claims that the trial court erred when it denied her motion for a new trial based on its refusal to allow evidence on "how the

---

[5]The court may do so "only when it is perfectly clear that the applicant does not raise even a colorable federal claim."  *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005).

1    subprime market really worked."  (Pet. at 6.)

2         The California Court of Appeal reviewed what occurred during the proceedings with

3    respect to these claims:

4              In June 2008, prior to trial, Valverde filed a motion to compel
         discovery.  She sought to compel the prosecution to "disclose evidence
5         obtained during the investigation of ACC Capital Holdings Corporation
         ('ACCCH') and its subsidiaries...."  Her motion asserted that Argent,
6         which was one of the lender victims of some of the grand theft counts, was
         a "subsidiary" of ACC Capital Holdings Corporation (ACCCH).
7         Valverde contended that "evidence obtained during [an] investigation of
         ACCCH" was "materially favorable to her defense" because it would
8         refute "the contention that Argent is a victim" of Valverde's conduct.

9              Her motion was based on the fact that the State of California and
         various district attorneys, not including the Santa Clara County District
10        Attorney, had brought a civil action in 2006 against ACCCH and various
         other entities, not including, Argent, alleging that they had made
11        misrepresentations to consumers, obtained inflated appraisals, and
         fabricated information on loan applications.  A multi-state settlement was
12        reached without ACCCH or the other entities admitting any fault.
         ACCCH and the other entities agreed to pay restitution of $295 million to
13        consumers who had obtained loans from them between 1999 and 2005 and
         $30 million to the states. They also agreed to not make misrepresentations
14        in the future, to change their appraisal practices, and to not make
         misrepresentations on loan applications.

15
              The prosecution opposed Valverde's motion on the grounds that
16        (1) the information sought was "not material and has no bearing on"
         Argent's conduct, and (2) the information was not in the prosecution's
17        possession because the civil action had not been brought by anyone on the
         "prosecution team," as it had been brought by states and the district
18        attorneys of other counties.  The court denied the motion without
         explanation.
19
              After trial commenced, the prosecution filed a motion in limine
20        seeking exclusion of evidence of "fraudulent conduct by Ameriquest
         Mortgage Company," an ACCCH subsidiary that was not involved in any
21        of the charged offenses.  This motion was prompted by the defense's
         mention of "Ameriquest" in their opening statements.  The prosecution
22        had objected during the opening statements, but its objection had been
         overruled.  The prosecution argued that such evidence would be irrelevant
23        and should be excluded under Evidence Code section 352 because it
         would confuse the jury.  Defendants opposed the motion on the ground
24        that the evidence in question would be relevant to the credibility of the
         prosecution's witnesses and to "the issue of lenders' reliance on loan
25        submissions."

26             Before the trial court ruled on the prosecution's motion, Tami
         Carnes, who had worked for Argent throughout the relevant period, and
27        had previously worked for Ameriquest, began her testimony.  She testified
         on direct that Argent is a wholesale lender.  Argent's parent company is
28        ACCCH.  Carnes testified that Argent relied on the information on the

loan application to determine the borrower's "credit worthiness." Argent depended on the broker "to do the due diligence on the information" that the broker provided to Argent. Her testimony was interrupted due to scheduling difficulties.

Before Carnes resumed her testimony, the court held a hearing on the prosecution's motion. The court repeatedly asked Valverde's trial counsel: "What evidence do you have through discovery or other purposes that business practice [of Ameriquest] was the business practice of Argent...." The court noted that the motion to exclude was aimed solely at evidence concerning Ameriquest, not evidence concerning Argent. "THE COURT: You can ask her [Carnes] about the lending practices at Argent. [¶] MR. UBHAUS [Valverde's trial counsel]: I want to ask her about the lending practices when she was at Ameriquest." "THE COURT: ...You can't even ask about Ameriquest unless [and] until the witness says that Argent followed the same practices of Ameriquest." "THE COURT: But why would you make any argument that the other lenders accepted anything less than what they should have or they didn't rely on the information? [¶] MR. UBHAUS: That's something we'll do two months from now. [¶] THE COURT: But why would you be able to do it at all? [¶] MR. UBHAUS: I don't know."

The court ruled "that the defendants are precluded from arguing or asking questions to show the alleged misconduct of other lenders again until relevance of that is shown." "[A]bsent a further showing of relevance, again there will not be argument that other lenders engaged in unlawful conduct...." The court "preclude[d] the defendants from asking questions about Ameriquest's lending practices or referring to the litigation that other prosecution or other agencies filed against ACC Holdings Corporation or the settlement in that case until there's a requisite showing that Argent followed the same lending practices as Ameriquest." Valverde's trial counsel responded to this ruling by saying that he "assume[d]" that he could "explore with Ms. Carnes her employment relationship, the relationship between Ameriquest and Argent without getting into it." The court responded: "Well, again, the foundation showing actually have the same lending practices [*sic*]." Valverde's trial counsel responded: "Right. I understand."

After this ruling, Carnes resumed her testimony. On cross by Valverde's trial counsel, Carnes testified that "Ameriquest and Argent... were completely different systems, different executives, different presidents, different HR, different buildings. I don't know -- after I left in 2000 with Ameriquest -- I don't know what Ameriquest did...." She denied that she was "familiar with what happened at Ameriquest." "I only dealt with Argent loans." Carnes explained that her work at Ameriquest was "in the back end. I didn't work in the branch office at Ameriquest." She "did certain underwriting for a particular product of loans" at Ameriquest. Carnes had never done any underwriting for Argent.

Out of the presence of the jury, during a break in Carnes's testimony on cross, the court reiterated: "the defendants are required to show that Ameriquest's lending practices were the same as Argent's lending practices before going into... Ameriquest's lending practices...." The court offered to hold an Evidence Code section 402 hearing, but Valverde's trial counsel declined. "[I]n light of Ms. Carne's answer, she

1  doesn't know anything about Ameriquest's lending practices, it would be
2  a pointless exercise." On redirect, Carnes reaffirmed that Argent relied on
   the documentation submitted by the brokers. She also confirmed that she
3  was familiar with Argent's underwriting policies.

4  (Op. at 5-8.)

5      The state appellate court then rejected these claims:

6          Defendants argue that the trial court's discovery ruling and its
       evidentiary ruling violated their rights to due process and "to present a
7      defense." They claim that the information sought by the discovery motion
       and excluded by the court's ruling on the prosecution's motion would
8      have shown an "industry practice" of "making loans to unqualified
       borrowers," which would have rebutted evidence that the lenders in this
9      case relied on defendants' misrepresentations, an element of the grand
       theft counts, and would have supported an assertion that defendants lacked
10     the specific intent to steal because it could be inferred that they were
       aware of this "industry practice." They maintain that the court's orders
11     precluded the presentation of evidence about "the prevalence of lending to
       unqualified borrowers" and "evidence that Ameriquest had been accused
12     by many states of inflating income to qualify borrower's [sic] for loans
       and had paid $320 million to settle that lawsuit." We find no merit in
13     these contentions for the simple reason that the information sought by the
       discovery motion and the evidence excluded by the trial court was not
14     relevant or material to any of the issues before the jury.

15         Defendants argue that information sought by the discovery motion
       that ACCCH and its retail lender subsidiaries "regularly made loans to
16     unqualified buyers using income and asset information known to the
       lender to be false" would have been "both exculpatory and had
17     impeachment value." In their view, it would have been exculpatory
       because it would "tend to show" that defendants' misrepresentations "did
18     not cause the lenders to make loans that would not otherwise have been
       made and that appellants did not intend to mislead the lenders." It would
19     have had impeachment value "because it contradicted the lenders'
       contentions that it was their policy to rely on brokers' representations in
20     making the loans."

21         "[N]o discovery shall occur in criminal cases except as provided
       by this chapter, other express statutory provision, or as mandated by the
22     Constitution of the United States." (§ 1054) The prosecution is required
       to provide to the defense "[a]ny exculpatory evidence" in its possession.
23     (§ 1054.1.) Information need not be disclosed if it lacks any "discernible
       exculpatory value." (*People v. Webb* (1993) 6 Cal.4th 494, 520.) We
24     review the trial court's discovery ruling for abuse of discretion. (*People
       of Ashmus* (1991) 54 Cal.3d 932, 979, abrogated on another point as
25     recognized in *People v. Yeoman* (2003) 31 Cal.4th 93, 117.)

26         The flaw in defendants' argument is that none of the information
       sought by the discovery motion concerned any of the lenders in this case
27     or even any wholesale lenders at all, and therefore it had no "discernible
       exculpatory value." Every one of the lenders in this case was acting as a
28     wholesale lender in the course of its interactions with defendants.

Order Denying Petition and Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\05353Valverde_denyHC.hl.wpd          13

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Wholesale lenders do not deal directly with borrowers, but deal solely with brokers.  The information sought in the discovery motion concerned solely *retail* lenders, who lend directly to borrowers and do not deal with brokers.  The alleged misconduct at issue in the civil action concerned only the direct interactions between retail lenders and borrowers.  The misrepresentations at issue in this case to which defendants claimed the information sought was relevant were by brokers, not lenders or borrowers, to wholesale lenders, not retail lenders or borrowers.  There was simply no basis for a belief that information about the alleged practices of retail lenders vis-à-vis borrowers would lead to exculpatory evidence relevant to the practices of wholesale lenders vis-à-vis brokers.  Consequently, the trial court did not err in denying the discovery motion.

As to the court's evidentiary ruling, defendants contend that "industry practice" evidence would have been admissible to rebut the prosecution's alleged reliance on the "assum[ption]" that "if the bank made the loan, it must have relied on [defendants'] representations."  This broad contention ignores the narrowness of the trial court's ruling.  The trial court's order excluded evidence concerning the lending practices of Ameriquest, one of ACCCH's retail lender subsidiaries, because there had been no foundational showing that any of the wholesale lenders involved in this case engaged in similar practices.  The court's order left open the possibility that such evidence could be admitted if defendants made the requisite foundational showing, which defendants conceded they could not make.

The other aspect of the trial court's evidentiary ruling was its exclusion of evidence that "other lenders" engaged in unlawful practices absent a foundational showing of relevance.  "We review for an abuse of discretion a trial court's exclusion of evidence."  (*People v. Brady* (2010) 50 Cal.4th 547, 558.)  Defendants never made any attempt to lay a foundation for the admission of evidence that the misconduct of lenders uninvolved in this case had any relevance to the conduct of the lenders who were involved in this case.  Due to the absence of such foundation, the trial court did not abuse its discretion in excluding evidence that had not been shown to have any probative value and that would have been confusing to the jury and unduly time consuming.  (Evid. Code, § 352.)

Valverde contends in her reply brief that the trial court's ruling wrongfully prevented defendants from "call[ing] experts to testify to the practices of the subprime mortgage industry."  The trial court's evidentiary ruling did not preclude defendants from seeking admission of expert testimony *if* they first made the requisite foundational showing of relevance.  Defendants never suggested below that they intended to present *expert testimony* on this issue, and they rejected the court's offer of an Evidence Code section 402 hearing at which they would have had the opportunity to make a foundational showing of relevance of whatever evidence they sought to admit.  Nor did they ever suggest that they were prepared to present any evidence regarding the "industry practice[s]" of wholesale lenders, which were the only lender practices at issue in this case.  Defendants' appellate arguments do not establish that the trial court's ruling was erroneous.

(Op. at 8-11.)

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original) (internal quotation marks omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *See Holmes*, 547 U.S. at 324. "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 325-26; *see Egelhoff*, 518 U.S. at 42 (holding that the exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.").[6] But "at times a state's rules of evidence cannot be mechanistically applied and must yield in favor of due process and the right to a fair trial." *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's application of its evidentiary rules to exclude hearsay testimony that bore persuasive assurances of trustworthiness and was critical to the defense violated right to present evidence). Even if an evidentiary error is of constitutional dimension, the court must consider whether the error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

Assuming that the trial court erred in denying the discovery request and excluding the evidence of general industry practice, petitioner is not entitled to relief because the error was harmless. *Id.* First of all, it is unlikely that the admission of such evidence would have changed the verdict because the information sought was simply irrelevant and not material to any of the issues before the jury as determined by the state appellate court: (1) the information regarding

---

[6]The defendant, not the state, bears the burden to demonstrate that the principle violated by the evidentiary rule "is so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Egelhoff*, 518 U.S. at 47 (internal quotation marks omitted).

retail lenders and their practices did not concern any of the specific lenders involved in the case or any wholesale lenders at all; and (2) petitioner's trial involved the interaction between brokers and wholesale lenders, not borrowers and retail lenders. *See supra* at 13-14. Accordingly, the state appellate court was not unreasonable in finding that such evidence had "no 'discernible exculpatory value'" with respect to petitioner's own conduct or that of the lenders with which she dealt. *Id.* As such, the jury was not likely to have given the excluded evidence much weight. Furthermore, the trial court provided that the "industry practice" evidence could be admitted if defendants could make the foundational showing that wholesale lenders involved in the case engaged in similar practices as those involved in the multi-state settlement case, but defendants conceded that they could not make that showing. *Id.* Nor could defendants make the foundational showing of relevance with respect to the unlawful practices of "other lenders." *Id.* Because defendants were unable to establish that such evidence was relevant, it cannot be said that the state appellate court was unreasonable in finding no error in the trial court's evidentiary ruling.

Petitioner argues in her traverse that the evidence of industry-wide practice to ignore state underwriting guidelines was relevant and should have been admitted. (Trav. at 7.) As discussed above, the trial court would have admitted the evidence if the defense could make the foundational showing of relevance. The defense could not.

Based on the foregoing, it cannot be said that the state court's rejection of Claims 1 and 7 was either contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on these claims.

### 2. Excessive Takings Enhancements (Claim 2)

Under Claim 2, petitioner claims that the evidence was insufficient to support the sentence enhancements under California Penal Code § 186.11 and § 12022.6 because the victims did not suffer any "loss." Under Claim 3, petitioner claims that the trial court erred when it failed to instruct the jury as to the definition of "a loss" as "net loss" in the sentence enhancement allegations.

United States District Court

For the Northern District of California

The state appellate court reviewed these two claims and found that the issue was mainly one of statutory construction because they were based on petitioner's interpretation of the word "loss":

> The jury found true, and the trial court imposed sentences for, enhancements under both section 12022.6, former subdivision (a)(4) and section 186.11, former subdivision (a)(2) as to each defendant. [FN5] Defendants challenge the sufficiency of the evidence to support these enhancements, and they also contend that the trial court's instruction on the section 12022.6 enhancement allegations was prejudicially inadequate. [footnote omitted.] Although their challenge is posited as one to the sufficiency of the evidence, defendants' contentions actually revolve around their interpretation of the word "loss" in section 12022.6. Thus, the issue is one of statutory construction.

> FN5. The section 12022.6 enhancement produced a four-year term for each defendant, while the section 186.11 enhancement led to a three-year-term for each defendant.

> The substantive offenses occurred in 2002, 2003, and 2004. The 1998 version of section 12202.6 was in effect at that time. [FN7] It provided: "When any person takes, damages or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows: [¶] (1) If the loss exceeds fifty thousand ($50,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of one year. [¶] (2) If the loss exceeds one hundred fifty thousand dollars ($150,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of two years. [¶] (3) If the loss exceeds one million dollars ($1,000,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of three years. [¶] (4) If the loss exceeds two million five hundred thousand dollars ($2,500,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of four years." (§ 12022.6, former subd. (a); Stats. 1998, ch. 454, § 2.)

> FN7. Section 12022.6 was amended in 2007 to change the various dollar amounts. (Stats. 2007, ch. 420, § 1.)

> The original version of section 12022.6, enacted in 1976, made no mention of "loss." It applied to a "taking or damage" in excess of various specified amounts. (Stats. 1976, ch. 1139, § 305.5.) The statute was amended in 1977 to include the "takes, damages, or destroys... and the loss exceeds" language that it now contains and contained at the time of defendants' offenses. (Stats. 1977, ch. 165, § 93.) The 1977 legislation was part of an omnibus bill, and there is no indication that it was intended to change the meaning of the statute.

Section 186.11 at the time of defendants' offenses provided: "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3)." Paragraph 2 provides for an additional term of two, three, or five years if the crimes "involve[] the taking of" more than $500,000. This additional term is in addition to that under section 12022.6. Paragraph 3 provides that, if the crimes "involve[] the taking of" more than $400,000 and less than $500,000, the punishment will be that imposed by section 12022.6. (§ 186.11, former subd. (a); Stats. 2001, ch. 854, § 21.)

Section 186.11 was originally enacted in 1995. (Stats. 1995, ch. 794, § 1.) It originally applied only to the "taking of" more than $500,000. [FN8] (*Ibid.*) It was quickly repealed and reenacted to lower that amount to $100,000. (Stats. 1996, ch. 431, § 2.) The only significant amendment of section 186.11 occurred in 2007, long after defendants' offenses.

FN8. The Legislature that enacted the original version of section 186.11 equated "taking" and "loss." (Sen. Com. on Crim. Proc., Rep. on Sen. Bill No. 950 (1995-96 Reg. Sess.) as amended Apr. 17, 1995, p. 2 [bill would apply "where there is a loss to a victim" of a certain amount].)

Defendants contend that the jury's findings on the enhancement allegations are not supported by any evidence that their offenses caused a "loss" exceeding $500,000 (under section 186.11) or $2.5 million (under section 12022.6). They maintain that the "face amount" of the loans made by the lenders to the borrowers, which they concede exceeded $2.5 million, was not equivalent to the lenders' "loss" because the lenders received security for those loans that exceeded the amounts of the loans. Defendants concede that "there was a 'taking' of the loan amount," but they argue that the loan amounts must be offset against the security, resulting in no "loss." Defendants also contend that, because the word "loss" has, in their view, a technical meaning of "*net* loss," the trial court prejudicially erred in failing to specially instruct the jury on this technical meaning. [FN9]

FN9. Because we reject defendants' interpretation of the word "loss" in section 12022.6, it naturally follows that no instruction on that incorrect interpretation was required.

(Op. at 11-14.)

The state appellate court then rejected the claim:

"'When construing a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law."' [Citations.] '[W]e begin with the words of a statute and give these words their ordinary meaning.' [Citation.] 'If the statutory language is clear and unambiguous,

United States District Court
For the Northern District of California

then we need go no further.' [Citation.] If, however, the language supports
more than one reasonable construction, we may consider 'a variety of
extrinsic aids, including the ostensible objects to be achieved, the evils to
be remedied, the legislative history, public policy, contemporaneous
administrative construction, and the statutory scheme of which the statute
is a part.' [Citation.] Using these extrinsic aids, we 'select the
construction that comports most closely with the apparent intent of the
Legislature, with a view to promoting rather than defeating the general
purpose of the statute, and avoid an interpretation that would lead to
absurd consequences.'" (*People v. Sinohui* (2002) 28 Cal.4th 205, 211-
212.) "Where reasonably possible, we avoid statutory constructions that
render particular provisions superfluous or unnecessary." (*Dix v. Superior
Court* (1991) 53 Cal.3d 442, 459.)

The language of section 12022.6 does not support defendants'
argument that "loss" means "net loss." Section 12022.6, former
subdivision (a)(4) applies where "any person takes, damages, or destroys
any property in the commission or attempted commission of a felony, with
the intent to cause that taking, damage, or destruction... [and] the loss
exceeds" $2.5 million. The statute contains no requirement that taking
"result in" a "loss." Instead, the statute plainly uses the word "loss" to
describe the level that must be exceeded only because "loss" is a general
term that may be applied to the amount *taken* from the victim *or* the
amount of loss the victim suffered due to *damage or destruction of
property.* [footnote omitted.] By using the general term "loss" to describe
both the amount of a taking and the harm to the victim whose property
was not taken but damaged or destroyed, the Legislature gave every
indication that it intended the statute to apply *as broadly* as possible. It
gave no indication that it intended for the scope of the statute to be
restricted to a victim's "net loss." Had the Legislature intended to limit
the statute's reach to a victim's "net loss," it easily could have inserted the
word "net" before loss. It did not do so. The language means what it
says. [footnote omitted.] It is axiomatic that a victim loses what is taken.
Section 12022.6 applies where the value of the property taken from the
victim or damaged or destroyed exceeds a certain level.

...

Defendants' challenge to the section 186.11 enhancements also
lacks merit. Section 186.11, as it read at the time of defendants' crimes,
did not refer to any amount of "loss" but explicitly to "the taking of" more
than $500,000. (§ 186.11, former subd. (a).) Since defendants concede
that they committed a taking of the face amounts of the loans, which
exceeds $2.5 million, they lack any basis for a challenge to the section
186.11 enhancements.

(Op. at 14-21.)

Respondent argues that a challenge to a state court's interpretation of state law is not

cognizable in federal habeas. (Ans. at 14, citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).)

The court agrees. The U.S. Supreme Court has repeatedly held that federal habeas writ is

United States District Court

For the Northern District of California

1   unavailable for violations of state law or for alleged error in the interpretation or application of

2   state law.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 861-62 (2011); *Estelle v. McGuire*, 502 U.S.

3   62, 67-68 (1991); *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Peltier v. Wright*, 15 F.3d 860, 861-62

4   (9th Cir. 1994); *see, e.g.*, *Little v. Crawford*, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim that state

5   supreme court misapplied state law or departed from its earlier decisions does not provide a

6   ground for habeas relief); *Franklin v. Henry*, 122 F.3d 1270, 1272-73 (9th Cir. 1997) (court was

7   bound by state court finding that a violation of state law had occurred, but still had to consider

8   whether the violation amounted to a federal constitutional error).  Federal courts generally are

9   bound by a state court's construction of state laws, *see, e.g.*, *Melugin v. Hames*, 38 F.3d 1478,

10   1487 (9th Cir. 1994) (federal court bound by Alaska Court of Appeals' interpretation and decision

11   that state statute was properly applied to petitioner's conduct), except when it appears that its

12   interpretation is an obvious subterfuge to evade the consideration of a federal issue, *see Peltier*, 15

13   F.3d at 862; *see also Little*, 449 F.3d at 1083 (petitioner might have been able to show that state

14   supreme court's interpretation and application of state law was constitutional error if it constituted

15   "a fundamental defect which inherently resulted in a complete miscarriage of justice," or

16   "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is

17   apparent") (internal quotation marks, brackets and citations omitted)).

18        Here, there was no "obvious subterfuge" in the state appellate court's reasoning with

19   respect to the enhancement statutes at issue.  *Peltier*, 15 F.3d at 862.  The state court gave a

20   lengthy discussion on the legislative history of § 12022.6 and § 186.11 and the plain meaning of

21   "loss" therein before rejecting petitioner's claim.  *See supra* at 17-18.  They also reviewed the

22   relevant case law and found no support for petitioner's argument that "loss" means "net loss."

23   (Op. at 17-20.)  Petitioner's repeated assertions in her traverse to that effect are not persuasive.

24   (Trav. at 11-12.)  Furthermore, her reliance on *United States v. Goss*, 549 F.3d 1013, 1017 (5th

25   Cir. 2008), is misplaced as this federal case law has no relevance to the interpretation and

26   legislative intent of state statutes.  Accordingly, this court is bound by the state court's

27   construction of state law, and no federal habeas relief is available to petitioner on Claim 2.

28        3.   <u>Jury Instruction Error (Claim 3)</u>

1    Under Claim 3, petitioner claims that the trial court violated her Sixth and Fourteenth

2    Amendment rights when it failed to instruct the jury as to the definition of "loss" within the

3    meaning of sections 12022.6 and 186.11 as "net loss."  As discussed above, this court is bound by

4    the state court's interpretation of "loss" in the sentence enhancements at issue.  *See, e.g.*, *Melugin*,

5    38 F.3d at 1487.  Because the state court disagreed with petitioner's proposed definition of loss,

6    the state court found no jury instruction was necessary: "Because we reject defendant's

7    interpretation of the word "loss" in section 12022.6, it naturally follows that no instruction on that

8    incorrect interpretation was required."  (Op. at 14, fn. 9.)

9    In rejecting Claim 2 above, this court found that petitioner's underlying claim regarding the

10   proper definition of "loss" under state law is no basis for federal habeas relief.  *See supra* at 20.

11   Therefore, her claim that the jury should have been instructed on "net loss" is also without merit

12   because it solely involves the interpretation of state law.  *Id.*  As the state appellate court found,

13   there was no deficiency in the jury instruction with respect to the element of "loss."  Accordingly,

14   petitioner is not entitled to habeas relief on this claim.

15                   4.   <u>Sentencing Error (Claim 4)</u>

16   Petitioner claims that the trial court abused its discretion when it imposed the term of 23

17   years and 8 months.  Respondent argues that a state court's discretionary sentencing decision is not

18   reviewable on federal habeas corpus.  (Ans. at 15, citing *Johnson v. Arizona*, 462 F.2d 1352, 1353-

19   1354 (9th Cir. 1972).

20   The state appellate court reviewed this claim:

21           The probation report recommended the terms that the court
     ultimately imposed.  Defendants asked the trial court to strike the
22   enhancements, or alternatively the punishment for the enhancements, on
     the ground that there was no evidence that the lender-victims had suffered
23   an actual loss.  They argued that "there was no loss or intended loss at the
     time of the transaction."  Defendants expressly declined to assert any other
24   basis for their request that the court strike the enhancements or the
     punishment for them. [FN15]  The prosecutor acknowledged that the court
25   had discretion to strike the punishment for these enhancements, but she
     argued that it should not do so because there were multiple victims, a
26   lengthy period of misconduct, and a large amount of money taken.

27           FN15. "THE COURT: Is there any other basis for the request or
     any invitation to consider striking those enhancements? [¶] MR.
28   UBHAUS: No."

Order Denying Petition and Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.13\05353Valverde_denyHC.hl.wpd          21

1

2   The prosecutor argued that defendants were deserving of the
    lengthy prison terms recommended in the probation report because they

3   took advantage of more than 20 individual victims, and the misconduct
    took place over a two-year period and was of increasing seriousness. The
    prosecutor acknowledged each defendant had one mitigating factor, no
    criminal history or an insignificant criminal history, but she relied on the

4   multiple aggravating factors: sophistication and planning; taking
    advantage of a position of trust; the length of time the misconduct

5   continued for; the number of victims; and the number of offenses.

6       Valverde's trial counsel argued that she should be granted
    probation because the lenders had lost nothing and the borrowers "didn't

7   qualify" for the loans they received. [FN16] "Valverde's participation in
    this, it was simply what everybody was doing." He argued that Valverde

8   "has lost far, far, far more than anybody who was a victim in this case."
    The disposition he sought was probation "with substantial community

9   service" and a fine. Valverde's trial counsel asserted that the probation
    department's recommended sentence would be disproportionate to the

10  offenses and the offender. Covarrubias's trial counsel joined in those
    arguments and also asserted that the sentence recommended by the

11  probation department "is one which ensures that there will be no
    restitution in the case."

12

13      FN16. With regard to restitution, the defense argued that little or
        no restitution was appropriate because the borrower-victims

14      "shouldn't have been able to refinance," and the lender-victims
        "didn't suffer any loss."

15      The court concluded that there was no basis for finding this to be
    an unusual case where probation should be granted. It explained that it

16  had considered the criteria in California Rules of Court, rule 4.413(c), and
    "[t]he evidence before the court indicates that the statutory limitation on

17  probation is not overcome." The court also concluded that defendants
    "would pose a threat to public safety if granted probation."

18

19      The court imposed the sentence recommended in the probation
    report and endorsed by the prosecutor. Valverde was sentenced to 23

20  years and eight months in state prison, while Covarrubias was sentenced
    to 19 years and eight months in state prison. The court expressly stated

21  that it had considered the mitigating factor that defendants had no prior
    record or an insignificant prior record, but it had found multiple

22  aggravating factors: the victims were "particularly vulnerable" because
    they did not speak English and trusted defendants; consecutive sentences
    could have been imposed, but were not, for some counts that involved

23  separate loans to a single victim; "the manner in which the crime was
    carried out indicate planning, sophistication or professionalism" and was

24  "distinctively worse than other crimes of its nature...." The court selected
    consecutive terms "because of the separate nature of the offenses...."

25  Although it recognized that it had discretion to do so, the court refused to
    dismiss or strike the excessive taking enhancements or the punishment for

26  them.

27  (Op. at 11-14.)

28      The state appellate court then rejected this claim:

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1
2
3
4

Valverde claims that her prison sentence was an abuse of discretion because she was a first time offender and her incarceration will prevent her from making restitution.  She also contends that the court's imposition of prison terms for the excessive taking enhancements was an abuse of discretion because the "loss" was "imaginary."  She maintains that the trial court abused its discretion in failing to strike the enhancements under section 1385....

5
6
7
8
9
10
11
12
13

To the extent that defendants are challenging the trial court's refusal to grant them probation, their challenge has no merit.  Probation was prohibited here unless the court found this to be an "unusual" case.  Except in unusual cases where the interests of justice would be best served if the person is granted probation, probation shall not be granted to any person convicted of a crime of theft of an amount exceeding one hundred thousand dollars ($100,000)."  (§ 1203.045, subd. (a).)  "The decision whether to grant or deny probation is reviewed under the abuse of discretion standard. [Citations.] 'An order denying probation will not be reversed in the absence of a clear abuse of discretion. [Citation.] In reviewing the matter on appeal, a trial court is presumed to have acted to achieve legitimate sentencing objectives in the absence of a clear showing the sentencing decision was irrational or arbitrary. [Citations.]'" (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1091.)  Thus, we must uphold the trial court's decision to deny probation unless it was irrational or arbitrary for the court to conclude that this was *not* an unusual case where the interests of justice would be best served by a grant of probation.

14
15
16
17
18
19
20
21

Defendants victimized more than 20 borrower-victims over a two-year period.  Using fraud, forgery, and coercion, they preyed upon these vulnerable individuals who came to them seeking to improve their financial situation.  These unsophisticated individuals placed their trust in defendants, and ended up paying exorbitant fees to defendants to obtain loans that often worsened their financial situation.  The fact that defendants persisted in their scheme for so long despite the complaints of the borrower-victims reflects that they do pose a danger to the community.  It follows that the trial court had a strong foundation for its conclusion that this was not the unusual case where the interests of justice merited a grant of probation despite the statutory prohibition.  None of the criteria in California Rules of Court, rule 4.413(c) apply here.  This case was only unusual in the sense that defendants had victimized so many people over such a long period of time.  We find no abuse of discretion in the court's denial of probation.

22
23
24
25

Defendants' challenge to the length of their prison terms is two-pronged.  First they claim that, because they lack a significant criminal history and their incarceration will not enhance their ability to make restitution, the court was obligated to impose less lengthy prison terms.  "It is established law that the severity of the sentence, within the statutory limits confided to the trial court, rests in its sound discretion." (*People v. Fritz* (1970) 11 Cal.App.3d 523, 527.)

26
27
28

Citing sections 6227 and 6228, they claim that the court should have considered sending them to a restitution center.  A defendant is not eligible to be sent to a restitution center unless the sentence does not exceed three years. [FN17] (Former § 6228.)  Given the massive scope of defendants' offenses, the trial court's decision that neither defendant

United States District Court

For the Northern District of California

would be adequately punished by a sentence of just three years, and therefore they were ineligible to be sent to a restitution center, was not an abuse of discretion. [footnote omitted.]

> FN17. After defendants were sentenced, the statute was amended to change the eligibility criteria to make eligible those defendants with sentences not exceeding five years. (§ 6228.) Even if the amended statute had been in effect at the time of sentencing, the trial court would not have abused its discretion in deciding that a prison term of just five years would be inadequate punishment for either defendant.

The absence of a prior criminal history does nothing to neutralize the extent of their criminality, which involved many, many offenses against more than 20 victims over a two-year period. This was not an isolated event but a sophisticated criminal enterprise. The trial court's determination that the many aggravating circumstances outweighed this single mitigating circumstance was well supported by the record and was not an abuse of discretion.

Nor was there any abuse of discretion in the trial court's determination that the need to impose appropriate punishment on defendants outweighed the impact that their incarceration might have on their ability to make restitution to the victims. Since hundreds of thousands of dollars in restitution was rewarded to the victims, and defendants, as convicted felons, would not be able to practice their profession, the possibility that they could make significant inroads on their restitution obligation was minimal. Meanwhile, their complex and longstanding criminal scheme suggested that their freedom would more likely lead to further offenses rather than to recompense for their many victims.

Their remaining contention is that the court should have stricken the two excessive taking enhancements because there was no "real loss." We have already rejected their claim that these enhancement allegations lacked evidentiary support. Our review of a trial court's decision under section 1385 is limited to deciding whether the ruling was an abuse of discretion. (*People v. Orin* (1975) 13 Cal.3d 937, 945.) We see no abuse of discretion here. Enormous sums of money were involved in defendants' offenses. Even just the amounts that defendants themselves reaped were in the hundreds of thousands of dollars. The mere fact that some of the victims may have been able to recover some of their funds does not minimize the culpability of defendants for these takings. The trial court could reasonably conclude that defendants should be fully punished for the excessive monetary scope of their offenses.

(Op. at 31-34.)

State sentencing courts must be accorded wide latitude in their decisions as to punishment. *See Walker v. Endell*, 850 F.2d 470, 476 (9th Cir. 1987), *cert. denied*, 488 U.S. 926, *and cert. denied*, 488 U.S. 981 (1988). Generally, therefore, a federal court may not review a state sentence

United States District Court

For the Northern District of California

1  that is within statutory limits. *See id.* However, the constitutional guarantee of due process is

2  fully applicable at sentencing. *See Gardner v. Florida*, 430 U.S. 349, 358 (1977). A federal court

3  may vacate a state sentence imposed in violation of due process; for example, if a state trial judge

4  (1) imposed a sentence in excess of state law, *see Walker*, 850 F.2d at 476; or (2) enhanced a

5  sentence based on materially false or unreliable information or based on a conviction infected by

6  constitutional error, *see United States v. Hanna*, 49 F.3d 572, 577 (9th Cir. 1995)

7         Here, the trial court neither imposed a sentence in excess of state law nor enhanced a

8  sentence based on materially false or unreliable information or based on a conviction infected by

9  constitutional error. Petitioner's argument is solely that the trial court abused its discretion, (Trav.

10  at 15-16), not that it imposed a sentence that was beyond statutory limits. Furthermore, the facts

11  as presented by the state appellate court do not indicate that the enhancements were imposed based

12  on materially false or unreliable information. Rather, the state appellate court found that the trial

13  court did not abuse its discretion in imposing an appropriate sentence for petitioner's crimes,

14  which involved multiple victims over a long period of time. *See supra* at 24. Lastly, petitioner's

15  argument that "there was no loss or intended loss at the time of the transaction" is without merit

16  because her definition of "loss," as discussed above, was incorrect under the state statute. *Id.* at

17  19-20. Because there was no due process violation, this court may not review petitioner's

18  sentence. *See Walker*, 850 F.2d at 476. Accordingly, petitioner is not entitled to habeas relief on

19  this claim.

20              5.    False Evidence (Claim 5)

21         Petitioner claims that she was convicted on the basis of false evidence, stating as follows:

22              Evidence from Box 36 was presented at trial, yet Box 36 was left behind
        at home in the garage. This is seen in the entrance and exit photos taken of the
23        home garage during the search and seizure which were taken by the D.A.
        Investigators on [M]arch 23, 2005. Any evidence which flows from a Poisoness
24        [*sic*] Tree is a violation of Petitioner's 4th Amendment Rights. Petitioner
        should have been granted an Evidentiary Hearing. Please see (Exhibit D p. 1-
25        4).

26  (Pet. at 5.)

27         Exhibit D contains four pages of photographs showing boxes on shelves in a garage, with

28

United States District Court

For the Northern District of California

1    handwritten notations identifying one box as Box 36.  (Pet. Ex. D.)

2        Respondent contends that this claim fails because it is not supported and is conclusory.

3    (Ans. at 16.)  Respondent also argues that to the extent the claim alleges an illegal search or other

4    violation of the Fourth Amendment, it is not cognizable on federal habeas corpus.  *Id.*  Petitioner

5    does not claim that she was not provided an opportunity to fully litigate this issue at trial.  The

6    court agrees that petitioner's claim is barred by *Stone v. Powell*, 428 U.S. 465 (1976) (holding that

7    federal habeas review of Fourth Amendment claims are barred unless the state did not provide an

8    opportunity for full and fair litigation of those claims).

9        With respect to the allegedly false evidence from Box 36, petitioner has failed to state a

10    claim under *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  A claim under *Napue* will succeed when

11    (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known

12    that the testimony or evidence was actually false, and (3) the false testimony or evidence was

13    material.  *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013).  Conclusory assertions will not do.

14    *See id.* (finding that petitioner's conclusory assertion that any testimony inconsistent with the truth

15    must be not only inaccurate but also perjured, does not constitute evidence sufficient to establish a

16    *Napue* claim).  Petitioner has failed to show that the alleged evidence was false and that the

17    prosecution knew or should have known that the evidence was actually false.  Without more, her

18    assertion is merely conclusory, which is not sufficient to state a claim.  *Id.*  Accordingly,

19    petitioner's claim does not merit federal habeas relief.[7]

20                    6.    Prosecutorial Misconduct (Claim 8)

21        Petitioner claims prosecutorial misconduct because the prosecution presented evidence

22    which they claimed was from Box 36 at trial when in fact Box 36 was left behind in petitioner's

23    garage after the search as shown in the pictures presented under Claim 5 above.  *See supra* at 25.

24    Therefore, petitioner claims that the evidence from Box 36 presented at trial was actually false.

25    Respondent claims that this claim is nothing more than a rephrasing of petitioner's Fourth

26    _____

27        [7]In her traverse, petitioner asserts ineffective assistance of counsel for the first time in
connection with this claim.  (Trav. at 17.)  Because she did not exhaust any ineffective

28    assistance of counsel claims in the state courts, the argument is not properly raised and shall
not be addressed by this court.  *See* 28 U.S.C. § 2254(b), (c).

1    Amendment claim improperly asserted in Claims 5 and 6.

2          Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard

3    of review is the narrow one of due process and not the broad exercise of supervisory power.

4    *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated

5    when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Id.*; *Smith v. Phillips*, 455

6    U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial

7    misconduct is the fairness of the trial, not the culpability of the prosecutor").   Where a prosecutor

8    is alleged to have violated his duty not to present or to fail to correct false evidence under *Napue v.*

9    *Illinois*, 360 U.S. 264, 269 (1959), the standard on habeas review is whether there is "any

10   reasonable likelihood" that the false evidence could have affected the jury's judgment, the

11   standard set forth in *United States v. Agurs*, 427 U.S. 97, 103 (1976).  *Hayes v. Brown*, 399 F.3d

12   972, 984 (9th Cir. 2005) (en banc); *see also Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013)

13   ("*Napue* requires us to determine only whether the error *could* have affected the judgment of the

14   jury, whereas ordinary harmless error review requires us to determine whether the error <u>would</u>

15   have done so.").

16         This claim fails because petitioner has failed to show that the alleged evidence was actually

17   false.  Petitioner merely repeats her conclusory allegations in her traverse, (Trav. at 18-19), which

18   are insufficient to support this claim.  Furthermore, without the exact nature of the false

19   information, the court cannot determine whether such false evidence could have affected the

20   judgment of the jury.

21         Petitioner also claims that the prosecution "knowingly misleading [*sic*] jurors about

22   Ventura's Fix Rate Option" and cites to pages 1 through 3 of Exhibit E and pages 1 through 9 of

23   Exhibit G.  (Pet. at 6.)  Respondent contends that the entire discussion about "false evidence"

24   supporting trial counts 4 and 5 and the Ventura fix rate loan appears to relate solely to evidence

25   presented by the prosecutor to the grand jury.  (Ans. at 18.)  Once a trial jury "convicts a defendant

26   of the charges upon which he was indicted, 'any error in the grand jury proceeding connected with

27   the charging decision [is deemed] harmless beyond a reasonable doubt.'"  *People of Territory of*

28   *Guam v. Muna*, 999 F.2d 397, 399 (9th Cir. 1993) (quoting *United States v. Mechanik*, 475 U.S.

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    66, 70 (1986)).  "In such a case, dismissal of the indictment will be appropriate only where 'the

2    structural protections of the grand jury have been so compromised as to render the proceedings

3    fundamentally unfair.'"  *Muna*, 999 F.2d at 399 (quoting *Bank of Nova Scotia v. United States*, 487

4    U.S. at 257, 108 S.Ct. at 2374.  *See also Mechanik*, 475 U.S. at 70–71 n. 1, 106 S.Ct. at 42 n. 1.

5    Here, there is no allegation that the grand jury proceedings were so compromised.  Accordingly,

6    this claim is no basis for federal habeas relief.

                              7.    Vindictive Prosection (Claim 11)

8           Petitioner claims vindictive prosecution based on what took place during the grand jury

9    proceedings in that the prosecutor presented false evidence to the grand jury about transactions

10   allegedly conducted by petitioner which had actually been conducted by another broker.  (Pet. at

11   8.)  As discussed above, *see supra* at 27, since petitioner was convicted by a trial jury of the

12   charges upon which she was indicted, any errors in the grand jury proceedings are deemed

13   harmless beyond a reasonable doubt.  *See Mechanik*, 475 U.S. at 66.  Furthermore, there is no

14   allegation that the structural protections of the grand jury were so compromised as to render the

15   proceedings fundamentally unfair.  *See Muna*, 999 F.2d at 399.  Accordingly, this claim fails.

                              8.    Destruction of Exculpatory Evidence (Claim 13)

17          Petitioner claims "bad faith destruction of potentially exculpatory evidence," specifically

18   police reports written up for "Francesca Dempster, Maria Carillo and many more alleged victims."

19   (Pet. at 9.)  Petitioner claims the evidence was intentionally destroyed "in order not to present

20   them to the defense counsel."  *Id.*  Respondent contends that this claim fails as too vague and

21   conclusory to support relief.  (Ans. at 22.)

22          In *Brady v. Maryland*, 373 U.S. 83 (1963), the U.S. Supreme Court held that "the

23   suppression by the prosecution of evidence favorable to an accused upon request violates due

24   process where the evidence is material either to guilt or to punishment, irrespective of the good

25   faith or bad faith of the prosecution."  *Id.* at 87.  The U.S. Supreme Court has since made clear that

26   the duty to disclose such evidence applies even when there has been no request by the accused,

27   *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment

28   evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985).

1  Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to

2  the defense, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449,

3  469-70 (2009).  In sum, for a *Brady* claim to succeed, petitioner must show: (1) that the evidence

4  at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was

5  suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put

6  differently, that prejudice ensued).[8] *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v.*

7  *Greene*, 527 U.S. 263, 281-82 (1999).

8        Petitioner's claim fails because she has failed to show that the evidence at issue was

9  favorable to her.  As respondent points out, petitioner fails to explain what the designated police

10  reports might have contained, or how victims Dempster and Carillo might have offered helpful

11  evidence for her at trial.  (Ans. at 22.)  Furthermore, petitioner does not explain how the

12  information contained in the police reports was material either to her guilt or punishment or how

13  the lack of their availability prejudiced her.  In her traverse, petitioner asserts that the D.A.

14  investigators coached the victims with an initial "story statement" explaining how petitioner and

15  her co-defendant were defrauding people.  (Trav. at 21.)  Be that as it may, petitioner does not

16  deny that she had access and opportunity to cross-examine the victims at trial.  Therefore, it cannot

17  be said that the absence of the alleged exculpatory evidence prejudiced her.  Accordingly,

18  petitioner fails to state a *Brady* claim, and she is not entitled to federal habeas relief thereon.

19                  9.    Prosecutorial Misconduct (Claim 14)

20        Petitioner claims that the prosecutor stopped or edited an undercover surveillance tape,

21  which violated her right to due process.  (Pet. at 9.)  Specifically, petitioner claims that the

22  "undercover surveillance tape done in the summer of 2004 with Sergio Sanchez was suddenly

23  stoped [*sic*] or edited."  *Id.*

24        This claim is without merit because petitioner fails to show how the alleged misconduct by

25  the prosecutor rendered her trial "fundamentally unfair."  *Darden*, 477 U.S. at 181.  She fails to

26  explain what the remainder of the tape would have revealed and specifically how the prosecutor

27

28        [8]For the purpose of Brady, the terms "material" and "prejudicial" have the same
      meaning. *United States v. Kohring*, 637 F.3d 895, 902 n.1 (9th Cir. 2011).

United States District Court

For the Northern District of California

1   edited the content.  Furthermore, as respondent points out, petitioner does not claim that she was

2   denied access to the tape or what she would have done differently with the tape.  (Ans. at 22.)

3   Petitioner's assertions in her traverse indicate that the claim is even more tenuous: "With only a

4   small part of the tape that was shown to the jury, the jury dismissed/dropped Sergio Sanchez's

5   count. If the whole tape had been played and the tape not edited by the D.A.'s office, who knows

6   how many more counts or ALL counts would have been dismissed/dropped...." (Trav. at 22.)

7   Petitioner's statement that the jury dismissed the Sergio Sanchez's count based on the surveillance

8   tape is simply conclusory, and the possible beneficial effect of the remainder of the tape on the

9   jury is purely speculative.  Accordingly, this claim lacks merit and is no basis for federal habeas

10  relief.

11                      10.      Judicial Bias (Claim 15)

12         In connection with Claim 14 above, petitioner claims that the trial judge acted out of bias

13  when he "did not allow all of the D.A. undercover surveillance tape to be played... [and] took out

14  most parts of the tape to help the Prosecution's case." (Pet. at 10.)

15         The Due Process Clause guarantees a criminal defendant the right to a fair and impartial

16  judge. *See In re Murchison*, 349 U.S. 133, 136 (1955); *Kennedy v. Los Angeles Police Dep't*, 901

17  F.2d 702, 709 (9th Cir. 1990).  A "biased decisionmaker [is] constitutionally unacceptable."

18  *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  A claim of judicial misconduct by a state judge in the

19  context of federal habeas review does not simply require that the federal court determine whether

20  the state judge committed judicial misconduct; rather, the question is whether the state judge's

21  behavior "rendered the trial so fundamentally unfair as to violate federal due process under the

22  United States Constitution."  *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (citations

23  omitted), *cert. denied*, 517 U.S. 1158 (1996).  A state judge's conduct must be significantly

24  adverse to a defendant before it violates constitutional requirements of due process and warrants

25  federal intervention. *See Garcia v. Warden, Dannemora Correctional Facility*, 795 F.2d 5, 8 (2d

26  Cir. 1986).

27         Here, as in the previous claim, petitioner has failed to establish that the trial judge's alleged

28  conduct with respect to the surveillance tape rendered the trial "fundamentally unfair." *Duckett*,

67 F.3d at 740.  Petitioner does not claim that she did not have access to the tape or of what specific relevance it would have had to her defense.  Rather, she merely alludes to the possible benefits the remainder of the tape might have had which is purely speculation.  (Trav. at 22.)  As such, petitioner fails to establish that the trial court's conduct was significantly adverse to her defense.  *See Garcia*, 795 F.2d at 8.  Accordingly, this claim is without merit.

## CONCLUSION

The petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a COA is DENIED.

The clerk is instructed to enter judgment in favor of respondent, terminate all pending motions, and close the file.

IT IS SO ORDERED.

DATED: __November 25, 2015__                    _Lucy H. Koh_____
                                                LUCY H. KOH
                                                United States District Judge

United States District Court

For the Northern District of California